### AMERICAN SUGAR REFINING CO. v. J. E. JONES & CO. et al.

(Circuit Court of Appeals, Fifth Circuit. October 25, 1923.)

#### No. 3968.

**1. Sales ⚷124—Buyer cannot rescind for breach of implied warranty, where goods cannot be returned.**

A purchaser of goods is not entitled to a rescission of the contract for breach of an implied warranty, unless there was an agreement to that effect, where, because of his sale of part of the goods, it is impossible to restore the status quo.

**2. Appeal and error ⚷1064(1)—Erroneous instruction, which may have been prejudicial, ground for reversal.**

Where two defenses were pleaded, and it cannot be determined on which the jury based a verdict for defendant, an erroneous instruction as to one defense cannot be held harmless error, though the verdict may be sustainable on the other.

In Error to the District Court of the United States for the Northern District of Alabama; William I. Grubb, Judge.

Action by the American Sugar Refining Company against J. E. Jones & Co. and others. Judgment for defendants, and plaintiff brings error. Reversed.

Leroy P. Percy, of Birmingham, Ala., for plaintiff in error.

Hugo L. Black, of Birmingham, Ala., for defendants in error.

Before WALKER and BRYAN, Circuit Judges, and CALL, District Judge.

BRYAN, Circuit Judge. This is a writ of error, sued out by the American Sugar Refining Company, plaintiff to a judgment in favor of J. E. Jones & Co., a partnership, J. E. Jones, and J. C. B. Gwin, defendants. The suit was on trade acceptances given by the defendants to the plaintiff for the purchase price of sugar. Defendants pleaded the general issue, with leave to give in evidence any special defense, in accordance with the Alabama practice.

The plaintiff is a manufacturer of sugar and syrup, and the defendants conducted a wholesale grocery store. There was no dispute as to the sale of the sugar, or the amount due thereon. But, prior to the purchase of the sugar, the defendants had purchased a quantity of syrup, and paid therefor an amount greater than the purchase price of the sugar. The defendants claimed that the syrup was unfit for consump-

tion as food, and that, at the time the trade acceptances for the sugar were given, the plaintiff agreed to take back such syrup as remained unsold at the maturity of the trade acceptance which should first become due, and allow the defendants credit for the same at the price which they had paid. During the period between the signing of the trade acceptances and the maturity of the one first falling due, the defendants sold some 200 cases of the syrup. The evidence was in conflict as to the quality of the syrup. According to the plaintiff's witnesses, it was of good, merchantable quality, and witnesses for the defendants testified that it was of bad quality and unsalable. On the issue of whether the plaintiff agreed to take back the syrup and allow credit for the purchase price, the witness Gwin, one of the defendants, testified:

"I told him the syrup was not salable; it wasn't any good, and we could not dispose of it. They agreed to take it up, and they must take it up; that I owed them for a car of sugar, and I was going to hold—withhold payment for the car of sugar until they made an adjustment on the syrup, take it up, and give us credit for it. We had a number of conferences about it, myself and Mr. Vance. He took it up with the office—promised to take it up with the office—in New York, and finally claimed he went to New York and had a conference with the head office; then he told me, if I would give acceptances for this syrup, for the sugar, that he would sell the syrup, and in the meantime put the acceptance six months off, so he could sell the syrup, in the meantime give me time to dispose of it; that he would either sell the syrup within that time, or else take it back and give us credit for it; give us credit for the syrup at the price we paid for it."

The witness Vance, superintendent for the plaintiff in Alabama, testified on direct examination:

"I told Judge Gwin on several occasions I could not take the syrup up. I had no authority to take it up; in other words, the company would not let me take it up. He asked me on several occasions if I would take it up. I don't think the judge took it up with me at the time the money became due on the sugar sold; about an extension of time, on account of times being hard. I think it was taken up with Mr. Arrans, if at all. I had a telephone conversation prior to the time these were signed. Miss Scarborough went to have the trade acceptances signed, and for some reason he did not sign them that day, and she came back, and I did not hear from the judge. I believe I called him from my house about 6 o'clock in the evening, and asked him why he would not sign the trade acceptances. I believe he mentioned to me—he did mention to me again—about taking up the syrup. I told him again—we had quite a long controversy over the telephone about taking up the syrup. I told the judge—he asked what I would do; would we take care of it in case the syrup went bad, and I believe I told him the company would take care of it assuredly, if the syrup went bad. That is the conversation over the telephone. I did not make any other statement to him about taking up the syrup to my knowledge. I feel sure I told him that my company would take care of him on any syrup he had, if it went bad. I had no authority to tell him I would take up the syrup; would turn it back. Not to my knowledge, I did not tell him that I would take—absolutely, take—it up. I told him, if it went bad, I was sure the company would take it up."

On cross-examination this witness testified:

"I said, if the syrup went bad, we would take care of him on bad syrup."

The District Judge charged the jury that, if the quality of the syrup was bad, there was a breach of an implied warranty, and the defend-

293 F.—36

ants would have the right to rescind and recover back the purchase price of such of the syrup as remained unsold, and further that, if they believed Gwin's testimony, there was a contract to take back the syrup, and the defendants, by reason of such contract, could recover back said purchase price. Plaintiff requested the court to charge that the jury could not find for the defendants on the issue that the syrup was not of the quality warranted, and that the quality of the syrup was not a defense to the suit.

There was no evidence of a loss due to the difference in value of the syrup as impliedly warranted and as delivered, and no claim was made for damages for breach of the implied warranty. The jury returned a verdict in favor of the defendants for the difference between the amount represented by the trade acceptances and the purchase price of the syrup which the defendants had not sold.

[1] The defendants were not entitled to a rescission for breach of the implied warranty, unless there was an agreement to that effect, because it was impossible on account of the sale of some of the syrup, to restore the status quo. Continental Jewelry Co. v. Pugh, 168 Ala. 295, 53 South. 324, Ann. Cas. 1912A, 657; Lyon v. Bertram, 20 How. 149, 15 L. Ed. 847. The defendants interposed two claims for rescission. The first was based upon breach of implied warranty alone, and without reliance upon any agreement, and the court charged that the breach alone would entitle the defendants to rescind, and to recover back from the plaintiff the purchase price of the syrup which had not been sold. This charge was erroneous, as appears from the cases above cited.

The charge as requested by the plaintiff sought to withdraw from the jury this claim of the defendants which was based solely upon breach of implied warranty, and should have been given. The jury was authorized to find a rescission without taking into consideration any agreement. There was no charge to the effect that, in addition to the implied warranty, an agreement was necessary under this first claim of the defendants. The defendants contend that the error, if any, was harmless, because plaintiff's agent, Vance, admitted that he agreed to take back the syrup which remained unsold, if it was bad, and the verdict involves the finding that the syrup was bad in quality. We do not think Vance's testimony can be held as a matter of law to have the effect of a binding obligation upon his principal. The utmost that Vance promised was that the plaintiff would "take care of" the defendant on bad syrup. It would be necessary to expand the quoted expression considerably in order to give to it the meaning that the plaintiff would accept a return of the syrup and refund the purchase price. The jury would have been warranted, as it seems to us, in finding that Vance was only expressing his opinion as to what the plaintiff would do, and that Gwin so understood.

[2] If it be conceded that there was evidence sufficient to sustain the verdict upon the second claim interposed by the defendants, to the effect that the plaintiff agreed to take back such of the syrup as remained unsold, it is nevertheless true that it is impossible to conclude that the jury

rendered its verdict upon this claim of the defendants, because upon it the evidence was also in conflict.

The conclusion is that the court erred in refusing the charges requested by the plaintiff.

The judgment is reversed.